John ILICK, et al., Plaintiffs,

v.

Robert MILLER, et al., Defendants.

No. CVN94–0314DWH.

United States District Court,
D. Nevada.

Sept. 28, 1999.

Donald York Evans, Reno, NV, Mohamedu F. Jones, National Prison Project of the American Civil Liberties Union Washington, D.C., for Plaintiffs.

Frankie Sue Del Papa, Attorney General, Harold A. Swafford, Senior Deputy Attorney General, Carson City, NV, for Defendants.

## MEMORANDUM DECISION AND ORDER

HAGEN, District Judge.

The court has previously found the plaintiffs to be "prevailing parties" within the meaning of 42 U.S.C. § 1988 (Docket # 160). Both plaintiffs and defendants have filed their briefs in support and against the award of fees to plaintiffs' counsel (Docket # 149, # 156 and # 158). Additionally, defendants have moved for reconsideration of the court's finding that plaintiffs are the "prevailing parties" in this case (Docket # 161). After consideration of those briefs and all supporting materials filed with them, and after review of the prevailing legal standards in the Ninth Circuit, the court finds again that the plaintiffs are the "prevailing parties," that the defendants' motion for reconsideration on those grounds is not well taken, and that an award of attorneys fees and costs to plaintiffs' counsel is appropriate. Because of the complexity of the attorneys fees issue, however, it is necessary for the court to examine each factual and legal issue in detail, as set forth below.

### 1. DEFENDANTS' MOTION FOR RECONSIDERATION

At the outset, the court must dispense with the defendants' motion for reconsideration. The court has previously ruled that the plaintiffs' lawsuit was the catalyst for the changes to the use of force policy at the Ely State Prison (herein "ESP") and to the mental health services available to inmates at that institution. (See Docket # 160). Based upon existing law and standards developed in this Circuit, the court thus held that the plaintiffs were the "prevailing parties" as a result of their role in instituting this litigation, and causing the important changes to take place at ESP. *See generally, Kilgour v. City of Pasadena,* 53 F.3d 1007, 1010 (9th Cir.1995); *see also Doty v. County of Lassen,* 37 F.3d 540, 547 (9th Cir.1994).

In their motion for reconsideration, however, defendants contend that such findings are themselves not sufficient for an award of fees to plaintiffs. Instead, defendants argue that there must be proof of a violation of plaintiffs' constitutional rights in order for a party to "prevail" for § 1988 purposes. Absent the introduction of evidence of the alteration of their unconstitu-

tional behavior, defendants claim that plaintiffs have not prevailed, and are accordingly not entitled to attorneys fees.

The difficulty in this case lies in the fact that plaintiffs and defendants agreed to a voluntary dismissal of all issues in the complaint after certain changes were instituted at ESP. Accordingly, the case was never really in a posture, such as after summary judgment or trial on the merits, in which a ruling could be made directly by the court finding the existence of unconstitutional behavior. Such a finding, however, appears to be unnecessary, for it is the *alteration* of the defendant's activity which is the goal of the lawsuit. *See Doty, supra,* 37 F.3d at 547. Detailed examination of the vehicle of the change in that behavior is less important than the fact that the change has occurred. Any other rule would exalt form over substance. The plaintiffs have achieved their goal by causing a significant alteration the defendants' use of force and mental health treatment policies.

And, even if evidence of a change in defendants' unconstitutional behavior were required, that evidence exists, together with proof that it was the plaintiffs' lawsuit that caused it. For example, Warden McDaniel admitted in his deposition that prison officials "weren't being trained ... according to policy." Further, the warden conceded that prison guards "had a tendency to shoot too much, to use gas, to overreact and let the gun and gas be an answer to [the prison's] problem." Excerpted from Deposition of E.K. McDaniel, November 1, 1995, pg. 202 at 5–22 ("McDaniel Deposition"), Exhibit F to Docket # 144. Likewise, the plaintiffs' medical expert, Dr. Metzner, found numerous and significant violations regarding inmates suffering from severe mental disorders, and suggested several significant steps be taken in order to ameliorate those problems. Of these, the most significant appeared to be the re-institution of the intermediate care unit ("ICU") for the longer term housing of seriously mentally ill prisoners. Exhibit H to Docket # 144.

The defendants' expert, Dr. Molde, maintained in his report that the overall mental health care at ESP was adequate, but then conceded that ESP needed to reinstitute the ICU as outlined by Dr. Metzner in order to provide adequate mental health care. Exhibit I to Docket # 144. Hence, the defendants' own witnesses and experts admitted that unconstitutional conditions existed at ESP prior to the institution of this lawsuit, and the court so finds these conditions existed.

Defendants nonetheless persist in their claim that the plaintiffs' lawsuit had nothing to do with the changes instituted at ESP, and that any alterations in ESP's policies or procedures had to do more with a change in administration than the filing of plaintiffs' lawsuit. Yet defendants supply no evidence to support their claim that all of these significant changes would have occurred without plaintiffs' intervention. Plaintiffs, on the other hand, have provided the court statistics which show a dramatic drop in shooting incidents after the initiation of the lawsuit. For example, in the year prior to the filing of lawsuit, there were 50 incidents of firearms' use, 20 incidents of chemical agents' use, and 128 incidents of "hands-on" use of force. After the lawsuit was filed in 1994, these numbers declined significantly. Beginning in 1995, there was a five-fold decrease in incidents involving firearms, the use of chemicals fell to a fraction of its previous level, and the number of incidents of "hands-on" use of force decreased nearly fifty percent.

The court has no doubt that the lawsuit bears significant responsibility for this change. Following the filing of the lawsuit and the class certification in late 1994, plaintiffs' counsel traveled to ESP on numerous occasions, and commenced investigation into *every* use of force at the prison. Warden McDaniel was acutely aware of this scrutiny, as he remarked during his deposition that he found it "bizarre" that lawyers would want to review such paperwork. He apparently discussed the in-

tense discovery several times with his supervisor, and appeared to be more than slightly miffed that the Attorney General's office had allowed such an "invasion" of attorneys from outside to scrutinize his institution and policies. McDaniel Deposition, at 9:7–11:25. While this evidence is not a direct causal link between the lawsuit and the decrease in use of force incidents, it is certainly some evidence of this fact.

In defendants' view, however, the court would have to find direct proof of a direct causal relationship between the lawsuit and the remedial changes in order to award fees. But such direct proof is seldom available, for "defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Sablan v. Dept. of Finance*, 856 F.2d 1317, 1326 (9th Cir. 1988). A recent Ninth Circuit case involving a § 1988 fee application before Senior United States District Judge Reed is instructive. In *Wilcox v. City of Reno*, 42 F.3d 550 (9th Cir.1994), the Ninth Circuit affirmed a $66,000 award of fees to an attorney that had secured a nominal ($1.00) damages award in a excessive use of force case. Subsequent to the filing of the lawsuit, the newly appointed city police chief adopted an express policy against the type of blow which caused plaintiff's injuries, and actually used the casino security tape of the blow to plaintiff's head to show "how not to do it." *Id.*, at 553. The district court found the seemingly disproportionate attorney's fee appropriate, in part because "[e]xposing an unconstitutional policy of this sort within the city police department does a great deal more than a finding that a plaintiff's rights have been infringed upon in some unspecified way." *Id.*, at 556. Accordingly, the district court ruled that the plaintiff had sustained an overall degree of success, despite the nominal award of damages by the jury, thus allowing the attorneys fee award. *Id.*

The city contended on appeal that the police department did not change its policy in response to the lawsuit, but because of the change in police administration. The Ninth Circuit dispensed quickly with the argument, noting that the district court was free, within the bounds of the clearly erroneous standard, to find a causal link between the lawsuit and the benefit to the policy department. Further, the Circuit found that the

> lawsuit achieved admirable results.... During the course of the litigation the city disciplined officer Tivis, whose misconduct may not have come to light but for the initiation of this lawsuit. Also during the course of litigation, the City [sic] modified its use of force policy. The litigation likely precipitated both the disciplining of Tivis and the change in policy.

*Id.*, at 556.

In this case, as in *Wilcox*, the court finds that the lawsuit has achieved "admirable results." As a result of this lawsuit, the care afforded to prisoners at ESP with serious mental health problems will return to the higher standard in place before the ICU was closed. Because the plaintiffs filed this lawsuit, the number of potentially deadly confrontations between prisoners and guards decreased immediately. Further, plaintiffs' lawsuit was at least partly responsible for ESP's adoption of a "controlled movement plan," which constituted a better policy regarding the use of force. The prisoners at ESP, the prison guards and administration, and the community at large will all benefit in the long run as a result of the changes. There is no evidence which suggests that the changes would have occurred without this litigation, and to suggest to the contrary is pure speculation.[1]

The plaintiffs are therefore "prevailing parties," and are entitled to attorneys fees

---

1. To the extent that the court is obliged to find that the post-PLRA fees were "directly and reasonably" incurred in proving a violation of a prisoner's rights, the court does so here. *See* 42 U.S.C. § 1997e(d). All of the evidence provided by plaintiffs shows there were violations of prisoner's constitutional right on an ongoing basis at ESP, and that this litigation caused those injurious practices to cease.

under § 1988. The defendants' motion for reconsideration is without merit, and is denied.

### 2. ATTORNEY'S FEES ANALYSIS

■ Having again concluded that the plaintiffs are the prevailing parties, the court is obliged to do the complete analysis under 42 U.S.C. § 1988. Pursuant to that statute, the court has discretion to award reasonable attorney's fees to the prevailing party. 42 U.S.C. § 1988; *see also Barjon v. Dalton*, 132 F.3d 496, 499 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 75, 142 L.Ed.2d 59 (1998). The Supreme Court has mandated that § 1988 fees are to be calculated according to the "prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Further, the Ninth Circuit has set forth certain factors to be used in calculating a "lodestar" attorneys' fees figure. *Kerr v. Screen Extras Guild*, 526 F.2d 67, 69–70 (9th Cir.), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973)(the "*Kerr*" factors, also codified in Local Rule 54–16). Thus, prior to the adoption of the Prison Litigation Reform Act, Pub.L.No. 104–134, 110 Stat. 1321, 42 U.S.C. § 1997e (1996), ("PLRA") the selection of the relevant community and the prevailing rates in that community, and the calculation of a lodestar under *Kerr* were the initial steps for the court in assessing § 1988 fees in prison reform litigation.

### A. Prison Litigation Reform Act Fee Cap

In the PLRA, however, Congress expressly limited the hourly rate for attorney's fees that can be awarded to prisoner's counsel by capping the maximum hourly rate and prohibiting payment of fees that are not "directly and reasonably" incurred in proving a violation of prisoner's rights. *See* 42 U.S.C. § 1997e(d). Specifi-

cally, § 803(d)(3) of the PLRA limited the hourly rate to 150 percent of the hourly rate set for court appointed CJA counsel in the particular district under 18 U.S.C. § 3006A. See 42 U.S.C. § 1997e(d)(3).

■ Defendants claim that the hourly CJA rates in this district are the $40 and $60 rates set forth in the CJA for out of court and in court work, respectively. But these rates are no longer the adopted rates for this District. The Judicial Conference of the United States has determined that a rate of $75 per hour is justified for Reno and Las Vegas, Nevada: "[t]he Judicial Conference has approved an hourly rate of $75 for in-court and out-of-court work for 93 of 94 of the judicial districts" including the District of Nevada (Reno and Las Vegas only). *See* Criminal Justice Act (CJA) Alternative Hourly Rates, Administrative Office of the United States Court Defender Services Division (May 9, 1996).

Unfortunately, the $75 hourly rate which the Judicial Conference has approved for this district has not yet been implemented due to the current unavailability of funds. The court finds the delay in implementing the approved CJA rate not controlling for the PLRA rate determination, however. First, the payment of these attorneys fees will not come from CJA funds, but instead from defendants own coffers. Thus, the fact that the $75 CJA has not yet actually been paid to lawyers in Reno or Las Vegas is not persuasive. Further, the PLRA sets the payment rate as 150% of the rate "established" by the CJA in 18 U.S.C. § 3006A. 42 U.S.C. § 1997d(3). It does not limit payment of fees to 150% of the CJA payments actually "paid" or "awarded." The critical word is "established." Here, the court finds the "established" CJA rate to be $75, for the Judicial Conference has already decided that this is the proper rate of pay. That the $75 rate is not currently paid due to lack of funds does not change the "establishment" of the $75 rate. As a result, the proper PLRA rate of pay is $112.50 per hour.[2]

---

**2.** It is uncertain whether the "relevant com-

munity" question has any bearing in the post-

### B. Timing of the PLRA Fee Cap

■ The PLRA was signed into law on April 26, 1996. There has been much litigation recently about the retroactivity of the mandate of the PLRA and the fee cap which it establishes. Fortunately, both the Supreme Court and the Ninth Circuit have addressed this issue, which simplifies the issue of retroactivity but complicates the court's mathematics task. In *Martin v. Hadix*, 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999), the Supreme Court held that the fee cap provisions of the PLRA are not retroactive past the effective date of the statute. *Id.*, at 2008. Applying the dictates of *Martin*, the Ninth Circuit thus held in *Madrid v. Gomez*, 190 F.3d 990 (9th Cir.1999), that prior § 1988 law applies to all fees billed up to the effective date of the PLRA (i.e., April 26, 1996), and that the PLRA fee cap applies to all fees billed after that date. *Id.*, at 994–95.[3]

As a result, the court must adhere to prior § 1988 law for all of plaintiffs' counsel's fees billed before April 26, 1996. As to fees billed after that date, the flat rate of $112.50 per hour established by the PLRA applies.

### C. Relevant Community

■ The first step in determining the pre-PLRA fees figure is to choose a relevant community. *See generally Barjon, supra*, 132 F.3d at 500. As a general rule, the relevant community is the forum in which the district court sits. *Id.*, (*citing Davis v. Mason County*, 927 F.2d 1473, 1488 (9th Cir.1991)). Another forum may be the proper relevant community, however, "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Id.*, (*quoting Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir.1992)). If qualified

counsel are not available in the local forum, the use of outside counsel is justified. *Id.*, at 501.

In this case, the plaintiffs urge the court to designate the District of Columbia as the relevant community, as they contend there were no local attorneys able or willing to take on a case of this nature. In support of their position, plaintiffs offer the affidavit of Susan Quig–Terry. In her affidavit, Ms. Quig–Terry states that she is an attorney licensed to practice law in Nevada, and that she has represented a number of individuals incarcerated at ESP under a sentence of death. Further, Ms. Quig–Terry states that she had been made aware of the unconstitutional conditions of confinement at ESP in early 1993, and that she did an initial investigation into those allegations. Following her initial investigation, Ms. Quig–Terry determined that the issues involved in the case were extremely complex, and that she did not know of any attorneys in Nevada with the resources or the skill which the case would require. Thereafter, Ms. Quig–Terry contacted the Nevada office of the American Civil Liberties Union with her initial findings, and was informed by the Nevada ACLU of their opinion that there were no attorneys in Nevada with the requisite skills and resources to conduct the type of litigation that the case would require. Consequently, Ms Quig–Terry was directed to the ACLU's National Prison Project in Washington, D.C., whose lawyers were touted as being among the most experienced in the nation in this field. Following additional consultation, the ACLU National Prison Project lawyers took on this case. Plaintiffs have thus carried their burden of making an initial showing that the relevant community should be designated as Washington, D.C.

---

PLRA world. If it does, all debate on this issue is put quickly to rest. The CJA rate established *and paid* for Washington, D.C. is $75 per hour, thus making the PLRA rate $112.50 per hour.

**3.** The court's decision herein regarding attorney's fees was delayed awaiting the rulings in *Martin* and *Madrid*.

■ Defendants, on the other hand, have provided no evidence to the contrary. In order to attack the plaintiffs' initial showing of a lack of local competent counsel, defendants should have provided the court with some form of evidence showing the availability of counsel in the Reno/Las Vegas area able to litigate a prison conditions case of this magnitude. Instead, defendants have supplied evidence in the form of affidavits demonstrating what the typical hourly rates are for attorneys in the Reno, Nevada area. This evidence is irrelevant, for the question is whether Reno (or Las Vegas) had attorneys that could do this type of prison reform work. Evidence of hourly rates in Reno has no bearing on this issue, and defendants have failed to provide relevant evidence.

■ The court may also use its own experience as a guide in billing matters. *See generally, Smith v. Freeman*, 921 F.2d 1120, 1122(10th Cir.1990)(court must use its own discretion in establishing hourly rates, as trial court is familiar with the case and prevailing rates in the area). In relation to the relevant community issue, the court is well aware of the dearth of local counsel able or willing to litigate prison reform cases. This district recently sought without success such counsel to litigate a similar case in Las Vegas, and can thus observe as a matter of its own experience the lack of lawyers in the Reno/Las Vegas area able or willing to do this work. Based upon the plaintiffs' uncontradicted evidence and the court's own experience, the court finds the relevant community for pre-PLRA fee purposes to be the Washington D.C. area, where plaintiffs' lead counsel is located.

## D. Determination of Fee Rates

Having dispensed with the preliminary questions, the court must get down to the actual calculation of fees. The first step in this process is to determine the rate at which hourly fees will be compensated.

As noted above, the issue is decided for post-PLRA attorney's fees, but remains open for pre-PLRA fees. The courts in the Washington D.C. circuit have adopted a uniform matrix, the so-called "Laffey Matrix," for use in calculating fees in § 1983 cases. *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354 (D.D.C.)(*rev'd in part,* 746 F.2d 4 (D.C.Cir.1984)); *see also Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C.Cir.), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 916, 133 L.Ed.2d 847 (1996). A true and correct copy of the Matrix was supplied by plaintiffs' counsel, and is attached hereto as Appendix "A." The fees which plaintiffs' counsel seeks are in concert with the Laffey Matrix. Once again, the defendants provided no countervailing evidence of fee rates in the Washington D.C. area, and, accordingly, the court concludes that the Laffey Matrix is the correct basis for assessing fee rates.

Review of the Laffey Matrix shows that the fee a particular lawyer is allowed to charge is based upon the lawyer's years of experience. As the lawyers' experience increases, the allowed fees increase as well. In this case, several of the lawyers were involved in the case long enough that their hourly rates changed. For the Washington, D.C. lawyers, then, the following are the allowed hourly rates prior to the PLRA [4]:

| Jones | 94–95 | $180.00 |
|---|---|---|
| | 95–96 | $185.00 |
| Lopez | 93–94 | $215.00 |
| | 94–95 | $220.00 |
| | 95–96 | $225.00 |
| Alexander | 94–95 | $310.00 |
| Balaban | 93–94 | $135.00 |

■ The proper rate for local counsel presents another question. The cases support payment of fees to local counsel, and suggest that the proper hourly rates are those for this district. *Guam Society of Obstetricians and Gynecologists v. Ada,*

---

4. Not all attorneys billed time to the case every year. Thus, a billable hourly rate is set forth for an attorney only if that lawyer billed work to the case in that year. No hourly rates are set out in this table for attorneys that billed time only after the PLRA, for that rate is $112.50 for all lawyers.

100 F.3d 691 696 (9th Cir.1996)(court affirming award of fees to local counsel based upon local fees paid within Guam district). Plaintiffs have provided evidence in the form of affidavits of local lawyers that suggest the proper hourly rate for a civil rights case of this type should be $200.00 per hour. The court believes that this rate is too high, considering, *inter alia,* the type of work required of local counsel (as opposed to lead counsel). Accordingly, the court believes that a rate of $125.00 per hour is appropriate for local counsel.

E. Hours Charged to the Case/*Kerr* Factors

 The next step is to determine the number of hours which are "reasonably" charged to the case. In meeting this task, the *Kerr* factors are of great help. These factors require the court to examine: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to the acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the result obtained; 9) the experience, reputation and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship; and 12) awards in similar cases. *Kerr, supra,* 526 F.2d at 70. The plaintiffs' bear the initial burden to show that time was reasonably expended.

The first *Kerr* factors are satisfied. Plaintiffs' counsel devoted significant time and labor to this case. Review of the billing records shows numerous trips by plaintiffs counsel to and from ESP to gather data, interview prisoners and copy records. Further, the court notes from the record that defendants were less than forthcoming with discovery than they could have been, which prompted at least several trips by plaintiffs' counsel to ESP which could just as easily have been accomplished by a collegial exchange of documents. And yet the court does not find the hours finally charged to the case by plaintiffs' counsel to be excessive. Plaintiffs' counsel has "no charged" 1,170 hours of time that represented work done on matters dismissed from the lawsuit in the early stages. After having reviewed the time sheets of plaintiffs' counsel, the court is satisfied that counsel are billing for only those matters on which they ultimately prevailed.

Similarly, the court notes that novel and difficult questions were involved in this case, which required lawyers with significant skill in this arena of litigation. The court has already concluded that there were no attorneys in Nevada that were able to handle this litigation, and that counsel from Washington D.C. were required to litigate the case. Indeed, it is possible that only attorneys that specialize in this type of litigation, together with nationally recognized experts in prison reform, could litigate this case to its proper end.

Whether this case precluded plaintiffs' counsel from working on other cases, the fourth *Kerr* factor, is unknown. Plaintiffs' affidavits suggest that their office is constantly deluged with requests from prisoners nationwide for assistance, and that they can only take a small handful of cases every year. Hence, it seems no stretch of imagination to conclude that plaintiffs' counsel's work here prevented their work on other cases elsewhere.

The fifth *Kerr* factor is satisfied by the Laffey Matrix, for the matrix's sole purpose is to provide the court with the customary fee for these lawyers. The sixth and seventh *Kerr* factors appear to have no relevance in this case.

As noted above, the court finds that the plaintiffs achieved impressive and important results in this case, thus satisfying the eighth *Kerr* factor. Likewise, the court was impressed with the abilities of the plaintiffs' counsel in litigating a difficult and "undesirable" case, which satisfies the ninth and tenth *Kerr* standards.

Finally, with respect to the last two *Kerr* factors, the court notes that the case extended over a period of four years—even longer than that, if investigation time is included. Plaintiffs' counsel, in that time, litigated a significant case from long distance, and did it well. The court has reviewed other fee awards in similar cases, and finds the ultimate fee award in this case appropriate.

Having found the general number of hours charged by plaintiffs to be reasonable, particularly in view of the number of hours "no-charged," the court has some specific items and categories with which it must take issue.[5] These are set forth below.

### 1. Travel Time

Plaintiffs' counsel has billed extensively for travel time. In total, over 700 hours have been charged solely for travel. This is not surprising, given the remoteness of ESP, and the fact that plaintiffs' lead counsel was located in Washington, D.C. The court further notes, however, that much of the travel time plaintiffs' counsel accrued was for discovery. Defendants could have saved plaintiffs substantial time and effort by supplying documents voluntarily, rather than merely making them available for inspection and copying. Hence, defendants have no room to complain when it comes to the number of hours charged by plaintiffs' counsel for travel.

■ Irrespective of any blame which defendants may bear in adding to travel time in the discovery phase of this lawsuit, the court nonetheless believes that the plaintiffs have billed excessively for travel time in one regard. The court believes that it is appropriate to allow compensation for travel time, because the attorney traveling on a case during business hours loses the opportunity to work productively on other matters. Hence, an attorney is entitled to bill for "lost productivity" time while traveling, irrespective of whether work is actually completed during the travel time. *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir.1984); *Gay Lesbian Bisexual Alliance v. Sessions*, 930 F.Supp. 1492, 1497–98 (M.D.Ala.1996).

■ Given the rationale for compensating attorneys and their staff for "travel time," the court believes it appropriate to limit such charges to a maximum of six (6) hours per attorney or staff member per day. Because of the remoteness of the Ely State Prison, plaintiffs' counsel were obliged to fly first to Las Vegas or Reno, and then drive to Ely, a trip which normally totaled over eleven (11) hours on average. But given that the rationale for allowing travel time is to compensate attorneys for hours which they would otherwise apply to other tasks, the court believes it is appropriate to limit travel time to a maximum of six hours in any twenty-four hour period. In the court's experience, most attorneys would be satisfied with six hours of billable time at the end of any working day, and, accordingly will limit the total amount of travel time to six hours per day.[6] The court has prepared a

---

**5.** Unfortunately for the court, the defendants have not commented on any specific hourly charges made by plaintiffs. In failing to do so, they have deprived the court of their assistance in reviewing the charges to determine whether they are "reasonable" under the circumstances. Despite defendants' lack of assistance the court has reviewed each time entry for which payment is sought, and, subject to the discussions below, finds them to be reasonable.

**6.** The court is aware that this rule yields a slightly odd result when plaintiffs' counsel did not complete the trip to ESP in one day, and

instead spent the night in Reno or Las Vegas. In those situations, the travel time for the trip from Washington to Las Vegas or Reno is billable on the first day, as is the travel time for the trip from Las Vegas or Reno to ESP. One might argue that this is an unfair result, and would encourage plaintiffs' inefficiency in traveling. Nonetheless, if the logic behind allowing travel time billing is to compensate for lost productivity due to travel, the rule must be applied in this manner, for plaintiffs' counsel "lost" productive hours during the second day's journey to ESP. In addition, the court notes that there were only a handful of occasions in which the trip to ESP was bro-

matrix of the trips that involve excessive charges for travel time, which is attached hereto as Appendix "B." A total of 159 hours have been deducted from plaintiffs' total fee request as a result.

### 2. Volunteer Attorney Billing

██ In a slightly similar logical vein, the court believes it is unreasonable for plaintiffs to seek compensation for hours charged by volunteer lawyers and staff. At the outset, the court wishes to express its sincere gratitude for all attorneys that donate time and effort in litigating important cases such as this on a *pro bono* basis. By their very nature, however, the volunteers that worked on this case did so without payment for their services for plaintiffs' counsel—at least, there is no evidence in the record of their having been paid by plaintiffs' counsel. Because they caused no fiscal impact on plaintiffs' counsel, it is unreasonable to seek compensation for the volunteer's work in terms of attorney's fees, and the court will not allow the hours they charged to be included in the lodestar calculation.

Any costs expended on behalf of such volunteers (such as airline travel to ESP, hotels, meals and the like) is another matter entirely. Those costs associated with volunteer lawyers and staff would have been associated with a paid lawyer or staffer if the volunteer had not done the work, and it is reasonable that those costs be included in the lodestar calculation.

### 3. Law Students

As with the volunteer lawyers and staffers, there is no evidence in the record that the law students that billed time to this case were compensated for their efforts. For the same reasons, then, the court will not include hours billed by law students in the lodestar figure, but will allow costs associated with them to be included.

### 4. Paralegals and Law Clerks

Reasonable hours charged to the case by paralegals and law clerks were compensable at the prevailing community rate in § 1988 jurisprudence prior to the adoption of the PLRA. *United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407–08 (9th Cir.1990). Accordingly, plaintiffs will be allowed their pre-PLRA paralegal and law clerk hours at the rates proven by evidence to be the prevailing rates in the relevant community.

██ A problem arises with respect to paralegal and law clerk hours after the adoption of the PLRA, however, because the PLRA is silent with respect to fees allowed to paralegals and law clerks. *See Roberson v. Brassell*, 29 F.Supp.2d 346, 353 (S.D.Tex.1998). Leaving the rates charged for paralegal and law clerk work at the pre-PLRA levels while reducing attorneys rates to $112.50 per hour as dictated by the PLRA is, to say the least, disproportionate. At least one court has *sua sponte* reduced the post-PLRA rate for paralegals in order to compensate for the lack of proportionality. *See Roberson, supra*, 29 F.Supp.2d at 353.

Given the clear congressional intent behind the enactment of the fee caps in the PLRA, the court has little choice but to reduce the fees allowed for law clerks and paralegals to some degree. Indeed, unless some reduction was put in place, the court would award fees for law clerks in this case in excess of those awarded for attorneys. Such a nonsensical result must be avoided.

Accordingly, the court will reduce both the post-PLRA hourly fees for paralegals and law clerks by 40%. The court did not pull this number out of thin air. Instead, the court reached this figure by comparing the post-PLRA hourly rate for attorneys ($112.50) to the pre-PLRA rates of the attorney that did the lion's share of the work in this case, Mr. Mohamedu Jones

---

ken up into two days, and during most of those "split" trips, plaintiffs' counsel conducted some form of additional business in Reno or Las Vegas, such as meetings with local

counsel, expert witnesses, or attending court hearings, time which was billable in addition to the travel time itself.

($180 and $185). Given that the post-PLRA rate for the largest number of attorney's hours is roughly 60% of the pre-PLRA rate, it seems appropriate to allow compensation for paralegal's and law clerk's time at 60% of the pre-PLRA rate.

Based upon the foregoing analysis, the plaintiffs are thus entitled to attorneys fees in the total amount of $331,133.18, which figure is based upon the following calculations:

| ATTORNEY | | HOURS | RATE | TOTALS |
|---|---|---|---|---|
| 1. Jones, Mohamedu | | | | |
| | No Charge | 640.00 | 00.00 | 00.00 |
| | 94–95 | 384.40 | 180.00 | $ 69,192.00 |
| | 95–PLRA | 211.50 | 185.00 | $ 39,127.50 |
| | Post–PLRA | 506.80 | 112.50 | $ 57,015.00 |
| 2. Lopez, Mark | | | | |
| | No Charge | 160.90 | 00.00 | 00.00 |
| | 93–94 | 87.80 | 215.00 | $ 18,877.00 |
| | 94–95 | 148.60 | 220.00 | $ 32,692.00 |
| | 95–PLRA | 188.50 | 225.00 | $ 42,412.50 |
| 3. Alexander, Elizabeth | | | | |
| | No Charge | 14.20 | 00.00 | 00.00 |
| | 94–95 | 2.80 | 310.00 | $ 868.00 |
| | 95–PLRA | 00.00 | —— | 00.00 |
| | Post–PLRA | 23.80 | 112.50 | $ 2,677.50 |
| 4. Winter, Margaret | | | | |
| | No Charge | 15.70 | 00.00 | 00.00 |
| | Pre–PLRA | 00.00 | 310.00 | 00.00 |
| | Post–PLRA | 121.10 | 112.50 | $ 13,623.75 |
| 5. Balaban, Eric | | | | |
| | No Charge | 8.00 | 00.00 | 00.00 |
| | 93–PLRA | 3.60 | 135.00 | $ 486.00 |
| | Post–PLRA | 18.70 | 112.50 | $ 2,103.75 |
| 6. Pittman, Jennie | | | | |
| | No Charge | 00.00 | 00.00 | 00.00 |
| | Pre–PLRA | 00.00 | 00.00 | 00.00 |
| | Post–PLRA | 12.60 | 112.50 | $ 1,417.50 |
| 7. Evans, Donald | | | | |
| | No Charge | 00.00 | 00.00 | 00.00 |
| | Pre–PLRA | 124.20 | 125.00 | $ 15,525.00 |
| | Post–PLRA | 64.85 | 112.50 | $ 7,295.63 |
| **PARALEGAL/LAW CLERK** | | HOURS | RATE | TOTALS |
| 1. N'Jie, Solomon | | | | |
| | No Charge | 52.90 | 00.00 | 00.00 |
| | Pre–PLRA | 37.50 | 80.00 | $ 3,000.00 |
| | Post–PLRA | 00.00 | 48.00 | 00.00 |

| PARALEGAL/LAW CLERK | HOURS | RATE | TOTALS |
|---|---|---|---|
| **2. Smith, Walter** | | | |
| No Charge | 25.60 | 00.00 | 00.00 |
| Pre–PLRA | 69.30 | 80.00 | $ 5,544.00 |
| Post–PLRA | 00.00 | 48.00 | 00.00 |
| **3. Dolby, Joan** | | | |
| No Charge | 3.25 | 00.00 | 00.00 |
| Pre–PLRA | 16.50 | 60.00 | 990.00 |
| Post–PLRA | 00.00 | 60.00 | 00.00 |
| **4. Ruttenberg, Miriam** | | | |
| No Charge | 10.95 | 00.00 | 00.00 |
| Pre–PLRA | 00.30 | 80.00 | 24.00 |
| Post_PLRA | 20.65 | 48.00 | 991.20 |
| **5. Portnoy, Rachel** | | | |
| No Charge | 00.00 | 00.00 | 00.00 |
| Pre–PLRA | 143.80 | 80.00 | 11,504.00 |
| Post–PLRA | 00.00 | 00.00 | 00.00 |
| **6. Paralegal of Local Counsel** | | | |
| Pre–PLRA | 3.20 | 65.00 | 208.00 |
| Post–PLRA | 4.15 | 39.00 | 161.85 |
| **7. Law Clerks** No Charge | 21.80 | 00.00 | 00.00 |
| Pre–PLRA | 49.70 | 130.00 | $ 6,461.00 |
| Post–PLRA | 12.00 | 78.00 | $ 936.00 |
| GRAND TOTAL FOR FEES | | | $331,133.18 |

---

Given the reductions in certain categories set forth above, and following the application of the *Kerr* factors, the court is satisfied that this award of fees is reasonable, and that no adjustment of fees is required. *See McGrath v. County of Nevada*, 67 F.3d 248, 252 (9th Cir.1995)(following calculation of lodestar figure under *Kerr*, court has discretion to adjust on the basis of factors not subsumed in initial calculation).

### F. Costs.

Plaintiffs are also entitled to an award of costs representing out-of-pocket litigation expenses. *United Steelworkers, supra,* 896 F.2d at 407. In total, plaintiffs seek an award of $41,272.75. This includes costs incurred in travel (airfare, car rental, hotels and food, gasoline and the like), telephone, postage and photocopying. The court notes for the record that plaintiffs have already deducted from their costs request those costs which can be attributed directly to an issue other than excessive use of force and mental health. As such, plaintiffs have already pruned their costs significantly to eliminate that for which they could make no claim as a "prevailing party." As to the remaining amount of costs, the only item which causes the court any difficulty is the

charge for in-house photocopying. Plaintiffs have charged $0.22 per page for copies, but the court believes this is too high. The court's own experiences suggests that a figure of $0.10 per page is much more realistic, and the court will therefore reduce the amount allowed for in-house copying by $1,291.36. With this reduction, plaintiffs lead counsel is entitled to an award of costs in the amount of $39,981.39. Given the length of this litigation, and the significant amount of discovery conducted over a long distance, the court finds this award of costs to be reasonable. *Id.*

Plaintiffs' local counsel is likewise entitled to an award of costs. Mr. Evans seeks an award of $2,015.73. The court has reviewed these costs carefully, and has compared them with the costs sought by the plaintiffs' lead counsel. Based upon that comparison, the court is satisfied that there is little, if any, unnecessarily duplicative billing for costs. Mr. Evans' had billed for photocopies at the $0.10 rate for most of the case except in one instance, where the a higher $0.25 rate was used.

Accordingly, the court will reduce this base cost award by $4.50, to $2,011.23. The court also notes from Mr. Evans' billing records that he has already been paid a total of $755.73 [7]. It is thus appropriate to reduce the cost award to Mr. Evans to reflect this payment. The total cost award to plaintiffs' local counsel will therefore be $1,255.60, which the court also finds a reasonable figure under the circumstances.

**IT IS THEREFORE ORDERED** that defendants' Motion for Reconsideration (Docket # 161) is DENIED.

**IT IS FURTHER ORDERED** that plaintiffs are awarded costs and fees from defendants in the total amount of $374,370.17. Of this amount, plaintiffs' lead counsel are entitled to $317,238.33 in fees and $39,981.39 in costs, and plaintiffs' local counsel is entitled to $15,894.85 in fees and $1,255.60 in costs.

**IT IS FURTHER ORDERED** that interest at the rate allowed by law shall begin to accrue on the entire award of fees and costs as of the date of the entry of this order.

## APPENDIX "A"
### LAFFEY INDEX
Years (Rate for June 1 -May 31, based on prior year's CP1–U)

| Experience | 80-81 | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 | 91-92 | 92-93 | 93-94 | 94-95 | 95-96 | 96-97 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20+ years | 165 | 175 | 185 | 195 | 205 | 210 | 220 | 230 | 245 | 260 | 275 | 285 | 300 | 305 | 310 | 315 | 325 |
| 11–19 years | 140 | 150 | 160 | 170 | 180 | 185 | 190 | 200 | 210 | 225 | 240 | 250 | 265 | 265 | 270 | 275 | 280 |
| 8–10 years | 120 | 125 | 130 | 135 | 140 | 145 | 150 | 155 | 165 | 175 | 185 | 195 | 210 | 215 | 220 | 225 | 230 |
| 4–7 years | 95 | 100 | 105 | 110 | 115 | 120 | 125 | 130 | 140 | 150 | 160 | 165 | 170 | 175 | 180 | 185 | 190 |
| 1–3 years | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 | 125 | 130 | 135 | 140 | 145 | 150 |
| Paralegals/law clerks | 30 | 35 | 35 | 40 | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 75 | 75 | 80 | 80 | 80 |

Taken from *Blackman v. District of Columbia.* 59 F.Supp.2d 37, 1999 WL 503544 (D.D.C. July 9, 1999).

## APPENDIX "B"
### TRAVEL TIME IN EXCESS OF 6.0 PER DAY

| | | | | |
|---|---|---|---|---|
| 1. | Balaban | 8/22/97 | RNO–DC | <u>8.5</u> |
| | | | | 2.5 |
| 2. | Jones | 8/1/94 | DC to RNO | 5.0 |
| | | | RNO to ESP | <u>6.0</u> |
| | | | | 5.0 |
| | | 11/12/94 | DC to LV | <u>7.5</u> |

---

7. These payments to Mr. Evans were from lead counsel's office, and have been included in costs approved for lead counsel.

| | | |
|----------|------------|------|
| | | 1.5 |
| 11/17/94 | ESP to LV | 4.8 |
| | LV to BWI | 6.1 |
| | | 4.9 |
| 11/20/94 | DC to RNO | 9.0 |
| | | 3.0 |
| 11/22/94 | RNO to BWI | 9.0 |
| | | 3.0 |
| 1/9/95 | DC to LV | 7.0 |
| | | 1.0 |
| 1/13/95 | ESP to LV | 4.0 |
| | LV to DC | 7.0 |
| | | 5.0 |
| 1/23/95 | DC to LV | 8.0 |
| | | 2.0 |
| 1/27/95 | ESP to LV | 4.5 |
| | LV to DC | 8.0 |
| | | 6.5 |
| 2/26/95 | DC to LV | 7.5 |
| | | 1.5 |
| 3/5/95 | LV to DC | 7.5 |
| | | 1.5 |
| 3/13/95 | DC to LV | 8.0 |
| | LV to ESP | 4.5 |
| | | 6.5 |
| 3/17/95 | ESP to LV | 4.5 |
| | LV to BWI | 8.0 |
| | | 6.5 |
| 7/24/95 | DC to LV | 7.0 |
| | LV to ESP | 4.5 |
| | | 5.5 |
| 7/28/95 | ESP to LV | 4.5 |
| | LV to BWI | 7.0 |
| | | 5.5 |
| 10/30/95 | DC to LV | 7.5 |
| | | 1.5 |
| 11/03/95 | ESP to BWI | 7.5 |
| | | 1.5 |
| 2/5/96 | BWI to LV | 7.5 |
| | LV to ESP | 4.5 |
| | | 6.0 |
| 2/9/96 | LV to BWI | 7.5 |

▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

| | | | $\overline{1.5}$ |
|---|---|---|---|
| | 6/3/96 | DC to LV | 7.5 |
| | | LV to ESP | 4.5 |
| | | | 6.0 |
| | 6/6/96 | LV to DC | 7.5 |
| | | | 1.5 |
| | 9/29/96 | DC to LV | 7.5 |
| | | | 1.5 |
| | 10/3/96 | LV to BWI | 7.5 |
| | | | 1.5 |
| | 11/22/96 | LV to DC | 7.0 |
| | | | 1.0 |
| | 2/6/97 | DC to PHX | 7.0 |
| | | | 1.0 |
| | 2/23/97 | DC to LV | 7.5 |
| | | LV to ESP | 4.5 |
| | | | 6.0 |
| | 2/25/97 | LV to BWI | 7.5 |
| | | | 1.5 |
| | 5/19/97 | BWI to SLC | 7.0 |
| | | SLC to ESP | 4.5 |
| | | | 5.5 |
| | 5/22/97 | SLC to BWI | 7.0 |
| | | | 1.0 |
| 3. Lopez | 10/20/93 | DC to ESP | 8.0 |
| | | | 2.0 |
| | 10/24/93 | LV to DC | 8.0 |
| | | | 2.0 |
| | 1/7/94 | DC to RNO | 7.5 |
| | | | 1.5 |
| | 1/18/94 | LV to DFC | 7.5 |
| | | | 1.5 |
| | 11/22/94 | LV to DC | 7.5 |
| | | | 1.5 |
| | 12/23/94 | DC to RNO | 8.0 |
| | | | 2.0 |
| | 1/5/95 | DC to RNO | 7.0 |
| | | | 1.0 |
| | 1/6/95 | RNO to DC | 8.0 |

| | | | | 2.0 |
|---|---|---|---|---|
| | 6/28/95 | DC to RNO | | 9.0 |
| | | | | 3.0 |
| | 7/2/95 | LV to DC | | 8.0 |
| | | | | 2.0 |
| | 10/30/95 | NYC to LV | | 7.0 |
| | | | | 1.0 |
| 4. N'Jie | 1/27/95 | ESP to LV | | 4.6 |
| | | LV to DC | | 7.0 |
| | | | | 5.6 |
| 5. Evans | 6/2/96 | RNO to ESP | | |
| | | ESP to RNO | | 12.0 |
| | | | | 6.0 |
| 6. Smith | 1/9/95 | DC to LV | | 7.5 |
| | | | | 1.5 |
| | 1/13/95 | ESP to LV | | 4.0 |
| | | LV to StL, MO. | | 5.0 |
| | | | | 3.0 |
| | 1/23/95 | DC to LV | | 8.0 |
| | | LV to ESP | | 4.0 |
| | | | | 6.0 |
| 7. Portnoy | 2/26/95 | DC to LV | | 7.5 |
| | | | | 1.5 |
| | 3/3/95 | DC to LV | | 7.5 |
| | | LV to ESP · | | 4.5 |
| | | | | 6.0 |
| | 3/13/95 | DC to LV | | 7.5 |
| | | LV to ESP | | 4.5 |
| | | | | 6.0 |
| | 3/17/95 | ESP to LV | | 4.5 |
| | | LV to DC | | 7.5 |
| | | | | 6.0 |

TOTAL DEDUCTIONS TO REFLECT MAXIMUM OF 6.0
BILLABLE TRAVEL DAY

159.00