Harry LOZEAU, et al., Plaintiffs,

v.

LAKE COUNTY, MONTANA, et al., Defendants.

No. CV–95–082–M–RFC.

United States District Court, D. Montana, Missoula Division.

April 4, 2000.

Michael G. Alterowitz, Alterowitz Law Office, Missoula, MT, Stephen L. Pevar, American Civil Liberties Union, Denver, CO, Mark S. Connell, Connell Law Office, Missoula, MT, for Plaintiffs.

Robert J. Long, Kim Christopher, Office of the Lake County Attorney, Polson, Robert E. Sheridan, Garlington, Lohn & Robinson, PLLP, Missoula, MT, for Defendants.

**ORDER**

CEBULL, United States Magistrate Judge.

Presently before the Court is Plaintiffs' counsel's petition for fees. Having reviewed the parties briefs and the applicable law, the Court accepts the fee petition as timely and orders payment as detailed below.

***BACKGROUND***

Plaintiffs filed the above-captioned matter in 1995, alleging various illegal conditions at the Lake County Detention Center (LCDC). The parties resolved the suit by way of a 1996, Consent Decree. A short time later, Plaintiffs brought a contempt action for enforcement of the decree, filed in 1997. The parties settled the action upon Defendants' contemporaneous acknowledgment that they had failed to comply with a number of the decree's requirements. Defendants further agreed to ameliorate those failures.

In mid–1998, Plaintiffs' counsel received renewed complaints and ultimately filed two more contempt actions in 1999. Plaintiffs' contempt actions sought rectification of allegedly inadequate: (1) staffing; (2) medical record keeping; (3) lighting; (4) plumbing; and (5) fire safety. In his deposition, Sheriff William Barron testified that:

1. Before he assumed the role of Sheriff, he knew of problems with the dispensation of medicine at the jail, and that the staff was chronically overworked and demoralized;

2. A significant portion of his campaign platform involved bringing LCDC up to standards;

3. Medical treatment and records at LCDC were substandard but subsequently remedied with changes to medical record keeping and the hiring of a new medical provider;

4. Before January, 1999, LCDC was understaffed and guards were forced to cook meals, which required time away from other necessary duties, including the dispensation of medicine, making head counts and performing suicide watch;

5. In an attempt to remedy problems, and despite budgetary cuts, the jail budget "went way up" in 1999 from $310,000 to $538,000 and he hired additional LCDC personnel, including a night cook;

6. The county commissioners were concerned about jail conditions and wanted to "get the ACLU off their back" because they didn't "want to be tied up in lawsuits";

7. He hired Ed Todd as the full-time jail administrator, in contrast to a previous position in which the undersheriff attempted to handle administration while performing other duties;

8. He and the county commissioners relied upon the investigations and reports of experts brought to LCDC as a result of the contempt actions in effecting changes in staffing, plumbing, lighting, fire safety and overall funding;

9. He discovered after taking office in January, 1999, the problems with lighting, plumbing and fire safety; and

10. ACLU complaints at the time he took office in January, 1999, had merit.

Jail Administrator Ed Todd corroborated Sheriff Barron's testimony. Mr. Todd noted that improvements had been ongoing since January, 1999, and that LCDC had since initiated a program of daily maintenance and sanitation checks, which allow LCDC personnel to frequently inspect the lighting, plumbing and cell conditions. Mr. Todd also testified that the collective goal has not been to only satisfy the terms of the Consent Decree, but to go about "the best way of doing" things. He also indicated that information concerning LCDC conditions uncovered during and after the filing of the contempt motions provided him with "ammunition" in his discussions with the county commissioners. The Court commends both Sheriff Barron and Mr. Todd for their candid testimony and efforts at reform.

Upon improvements in these areas, Plaintiffs agreed to dismiss the contempt actions. The parties also dismissed the underlying Consent Decree; in its stead, they executed a Private Settlement Agreement (settlement agreement). Pursuant to the fee-shifting provisions of 42 U.S.C. § 1988 and the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d), Plaintiffs now seek attorneys fees associated with the prosecution of the 1999 contempt actions.

Defendants, however, level objections to fees in any amount. First, Defendants argue Plaintiffs are barred under principles of contract law. The parties' settlement agreement provided that Plaintiffs' counsel would make a fee request within thirty (30) days of "the below date"; the settlement agreement was ultimately dated December 13, 1999. Notwithstanding this language, the parties subsequently submitted a proposed order, drafted by defense counsel, which read "Plaintiffs shall have 30 days in which to file a request for attorney fees and costs." The Court signed that Order on December 16,

2000. Plaintiffs filed the fee request twenty-nine (29) days later, within the time contemplated by this Court's Order but outside the time frame set forth by the settlement agreement. Defendants contend that under the terms of the parties' contract, Plaintiffs failed to timely file.

Defendants further assert that fees are inappropriate because Plaintiffs have submitted no proof of "actual violations" as contemplated by the terms of the PLRA, and the Court has issued no rulings as to the existence of those violations. Consequently, Defendants urge that the fee petition be summarily dismissed and that Plaintiffs' counsel take nothing from the prosecution of the aforementioned contempt actions.

## DISCUSSION

Defendants' arguments require a three-step inquiry. First, the Court must determine whether the fee petition can be considered timely filed. If the petition is timely filed, the analysis turns next to whether direct proof of an "actual violation" is a condition precedent to an award of attorneys fees. If Plaintiffs' petition survives this argument, the Court must then weigh the petition itself. This final step requires not only consideration of Defendants' objections but an independent evaluation and determination by the Court of reasonable fees and costs.

### I. The Fee Petition Was Timely Filed.

### A. Mutual Mistake

■ This inquiry is governed in part by contract law. Mont.Code Ann. § 28–2–1611 (1999) provides:

[w]hen, through fraud or a mutual mistake of the parties or a mistake of one party while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done

without prejudice to rights acquired by third persons in good faith and for value. "For centuries courts of equity have exercised the right to reform contracts on the ground of mistake and to make them represent truly the intentions of the parties." *Ayers v. Buswell*, 73 Mont. 518, 524, 238 P. 591, 592 (1925) (citing 2 *Pomeroy's Equity Jurisprudence* § 8 (4th ed.)). Every mistake involves negligence to some extent. *Bitter Root Creamery Co. v. Muntzer*, 90 Mont. 77, 89, 300 P. 251, 254 (1931) (citing *Ayers*, 238 P. at 594). If the negligence is excusable under the circumstances, and no rights of innocent third parties are involved, reformation is proper. *Id.* (citing *Parchen v. Chessman*, 49 Mont. 326, 142 P. 631 (1914); *First State Bank of Philipsburg v. Mussigbrod*, 83 Mont. 68, 271 P. 695 (1928)). The correct standard for reformation is by clear, convincing and satisfactory proof. *Story v. Bozeman*, 259 Mont. 207, 225, 856 P.2d 202, 213 (1993). Upon such showing, equity will intervene. *See Humble v. St. John*, 72 Mont. 519, 234 P. 475 (1925).

In *Bitter Root*, plaintiff argued that defendant should not be permitted reformation; the evidence showed that defendant negligently failed to read a note before signing it. 300 P. at 254. Rejecting this proposition, the Court reasoned, "[e]very mistake involves the idea of negligence to a greater or lesser degree. And, if the negligence consists of failing to read the document involved, and is excusable under the circumstances, and no rights of innocent third parties are involved, reformation may be had." *Id.* (internal citations omitted).

Similarly, in *Mussigbrod*, plaintiff's counsel argued that the absence of fraud or misrepresentation, coupled with defendant's negligent failure to read a mortgage, barred reformation. 271 P. at 701. Again, the Court rejected this contention in favor of the proposition that "where the mistake was mutual and the circumstances such as to excuse the negligence of the complaining party, relief, by way of cancel-

lation or reformation, may be granted." *Id.* (citing *Brundy v. Canby*, 50 Mont. 454, 148 P. 315 (1915); *Cox v. Hall*, 54 Mont. 154, 168 P. 519 (1917); *Kummrow v. Bank of Fergus County*, 57 Mont. 390, 188 P. 649 (1920)).

Although this case cannot be so neatly classified, the parties' inability to pick a date and consistently apply it demonstrates that the requisite "meeting of the minds" did not occur as to the date upon which Plaintiffs would file their fee petition. In fact, the actions of both parties betray argument to the contrary. It is obvious that Plaintiffs believed the settlement agreement set a thirty day deadline tied to the date of the Court's Order; Plaintiffs communicated their desire to base the thirty day deadline upon the undersigned's signature before execution of the settlement agreement. It is equally obvious that Defendants interpreted the settlement agreement in precisely the same manner as Plaintiffs, submitting a proposed order that merely required the petition be filed within thirty days of this Court's Order, not within thirty days of December 13. Review of the proposed order only confirmed a deadline thirty days post-Order.

It is also important to note that the proposed order setting the post-Order deadline was filed after, not before, execution of the settlement agreement. The parties very easily could have cited a specific date in the proposed order. However, the proposed order mentioned no specific, pre-set date by which the petition was due. At the same time, the settlement agreement clearly contemplated that Plaintiffs would file a fee petition. The foregoing recognizes and is entirely consistent with an uncontrollable variable—when the court will actually sign its order—and prevents the parties from litigating a fee dispute before resolution of the underlying action upon which fees may be determined and collected.

The Court finds that this predicament arises out of the varying negligence of

both parties, that such negligence was both inadvertent and excusable under the circumstances, and that no rights of innocent third parties will be adversely affected by reformation. *See Bitter Root*, 300 P. at 254. The contract is appropriately reformed to mark a petition due date thirty days post-Order. Accordingly, Plaintiffs timely filed the fee petition before the Court.

### B. *Public Policy*

Assuming, arguendo, no mistake were found, as a matter of policy the Court could not in good conscience allow defeat of Plaintiffs' fee request in this regard. Defense counsel drafted and submitted a proposed order before this Court. The proposed order set a date different from that contained within the settlement agreement, and this Court signed the proposed order. If Defendants (or the parties collectively, for that matter) intended for the December 13, 2000, date to stand as the cutoff, the proposed order logically should have referenced that date instead of submitting one so inconsistent with that result. Upon past experience the undersigned acknowledges the reasonableness of relying upon deadlines set in court documents as controlling deadlines. Those deadlines are rarely, if ever, second-guessed.

The Court relied upon the proposed order drafted and submitted by Defendants. Plaintiffs reasonably relied upon the information contained in the subsequent Order, which only reinforced their interpretation. This is not to say Defendants engaged in misconduct of any sort. In fact, it squares with the Court's foregoing discussion of mutual mistake. Nonetheless, misinterpretation of an unambiguous court order is entirely different from proper interpretation of an unambiguous one. This policy seems especially compelling where the proposed order has been drafted and submitted by only one party to the litigation, although it remains sound even absent such circumstances. Furthermore, it is

consistent with Montana policy that ambiguities or uncertainties be construed against those creating them. *See Fitzgerald v. Aetna Insurance Co.*, 176 Mont. 186, 191, 577 P.2d 370, 373 (1978) (language is construed most strongly against the drafting party because it is his language that created the uncertainty); *Mueske v. Piper, Jaffray & Hopwood*, 260 Mont. 207, 216, 859 P.2d 444, 449–50 (1993).

### II *Fee Entitlement Under The PLRA*

██ Plaintiffs filed this action under the terms of 42 U.S.C. § 1983. The court, in its discretion, may allow the prevailing party in a civil rights action or a party conducting subsequent monitoring and/or enforcement of a judgment or consent decree a reasonable attorney's fee. 42 U.S.C. § 1988(b); *see also Sage v. Risley*, 785 F.Supp. 134, 136 (D.Mont.1992). "While a civil rights plaintiff must succeed on some aspect of the merits of a civil rights claim before he can be considered a 'prevailing party,' it is not necessary that he ultimately prevail on every claim asserted or obtain all the relief requested." *Sablan v. Department of Finanace of the Commonwealth of Northern Mariana Islands*, 856 F.2d 1317, 1324 (9th Cir.1988) (citing *Jensen v. City of San Jose*, 806 F.2d 899, 900–01 (9th Cir.1986) (en banc); *Reel v. Arkansas Department of Correction*, 672 F.2d 693, 697 (8th Cir.1982)). Rather, it is enough that a plaintiff succeed on any significant issue in the litigation if such success advances a portion of the benefit sought in filing suit. *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Clark v. City of Los Angeles*, 803 F.2d 987, 989 (9th Cir.1986); *Harris v. McCarthy*, 790 F.2d 753, 757 (9th Cir.1986)).

In 1996, Congress passed the PLRA, which significantly altered the availability of attorneys fee awards in prisoner cases. In pertinent part, the PLRA provides:

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which at-

torney's fees are authorized under section 2 of the Revised Statutes of the United States (42 U.S.C. § 1988), such fees shall not be awarded, except to the extent that—

> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 2 of the Revised Statutes; and
>
> (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
>
> (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

42 U.S.C. § 1997e(d). The PLRA further limits the available rate to 150 percent of the hourly rate set for court-appointed CJA counsel in the district where a plaintiff files suit. *Ilick v. Miller*, 68 F.Supp.2d 1169, 1174 (D.Nev.1999) (citing 42 U.S.C. § 1997e(d)(3)).

Congress passed the PLRA in order to "curtail frivolous prisoners' suits and to minimize the costs—which are borne by taxpayers—associated with those suits." *See Madrid v. Gomez,* 190 F.3d 990, 996 (9th Cir.1999). It is further aimed at preventing convicted criminals from receiving "preferential treatment" more aptly reserved for "law-abiding" citizens. *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094–95 (S.D.Cal.1999) (citing 144 Cong.Rec. 575251 daily ed. May 25, 1995 (statement of Senator Dole); *Green v. Nottingham,* 90 F.3d 415, 417 (10th Cir.1996); *Schagene v. United States,* 37 Fed.Cl. 661, 661 (1997)). That said, Congress never intended the PLRA as a bar to meritorious suits, notwithstanding a claimant's prisoner status. *See Cooper,* 55 F.Supp.2d at 1095.

As detailed below, fees are appropriate in this case because: (1) no concomitant judicial finding of an "actual violation" is required before an award of fees under § 1988; (2) Plaintiffs' monitoring and contempt motions are both reasonable and causally related to recent changes made at LCDC; and (3) the courts have consistently supported the pretrial settlement of claims and enforcing a requirement of judicial resolution is antithetical to the ideal of judicial efficiency and contrary to public policy.

*A. A Finding By The Court That Defendants Have Committed Actual Violations Of Plaintiffs' Constitutional Rights Is Not A Condition Precedent To An Award Of Fees.*

■ Without citation to relevant case authority, Defendants' first argue that Plaintiffs are not entitled to fees in this case because "no actual violation of Plaintiffs' rights has been proven." (Def.'s Br. p. 4, lns. 15–17). However, the law is well-settled that a party need not obtain relief in the form of a final judgment in order to receive fees under § 1988. *See Hewitt v. Helms,* 482 U.S. 755, 760–61, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987); *see also Sablan,* 856 F.2d at 1324 (" 'plaintiffs need not obtain formal relief in order to enjoy prevailing party status.' " (quoting *Clark,* 803 F.2d at 989); *Ward v. County of San Diego,* 791 F.2d 1329, 1334 (9th Cir.1986)). Accordingly, where a civil rights lawsuit forces change and settlement before judicial trial, an award of attorneys fees is appropriate. *Ilick,* 68 F.Supp.2d at 1172.

In *Ilick,* the parties agreed to voluntary dismissal of all issues after defendants instituted satisfactory changes at a state prison. *Id.* The settlement foreclosed the court's opportunity to issue a formal ruling regarding unconstitutional conditions at the prison. *Id.* Defendants seized upon the pretrial dismissal as grounds for denying plaintiffs' fee petition, arguing that "there must be proof of a violation of plaintiffs' constitutional rights in order for a party to 'prevail' for 1988 purposes." *Id.* at 1171. Defendants further theorized that, because plaintiffs introduced no evidence of defendants' purportedly unconstitutional actions, plaintiffs could not "prevail," and were prevented from collecting

fees. *Id.* at 1171–72. Rejecting this contention, the court reasoned:

> [s]uch a finding, however, appears to be unnecessary, for it is the alteration of the defendant's activity which is the goal of the lawsuit. Detailed examination of the vehicle of the change in that behavior is less important than the fact that the change has occurred. Any other rule would exalt form over substance. The plaintiffs have achieved their goal by causing a significant alteration [of] the defendants' use of force and mental health treatment policies.

*Id.* at 1172 (internal citations omitted); *see also Hanrahan v. Hampton,* 446 U.S. 754, 757, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) ("parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief.").

The court further noted that, even if evidence of constitutional violations was required, such evidence existed, together with the implication that plaintiffs' lawsuit brought necessary change. *Id.* In so holding, the court focused upon: (1) the prison warden's admissions during his deposition that prison officials were not trained according to policy; (2) the warden's admissions that prison guards tended to discharge their weapons too often, use gas and "overreact" to prison problems; (3) the discovery by plaintiffs' expert of the illegal treatment of inmates suffering severe mental disorders; and (4) concessions by defendants' expert that the prison needed to reinstitute an intermediate care unit, per plaintiffs' expert's recommendation, in order to provide adequate mental health care. *Id.* The court assigned great weight to the fact that defendants' own witnesses and experts admitted the existence of unconstitutional, pre-lawsuit conditions. *See Id.*

Defendants also argued that plaintiffs' lawsuit merely coincided with a change in administration and was not the source of change. *Id.* However, while plaintiffs supplied relevant deposition testimony and statistics, defendants supplied no evidence supporting that claim. *Id.* Accordingly, the court found "no doubt" that the lawsuit bore significant responsibility for change at the prison. *Id.*

The court also addressed Defendants' flawed argument that it first find direct proof of a direct causal link between the lawsuit and subsequent remedial changes before awarding fees. *Id.* at 1173. It noted that "such direct proof is seldom available, for 'defendants, on the whole are usually rather reluctant to concede that the litigation prompted them to mend their ways.'" *Id.* (quoting *Sablan,* 856 F.2d at 1326). Rather, within the bounds of the clearly erroneous standard, it noted that courts are free to find a causal link between lawsuits and subsequent remedial action. *Id.* The court recognized that the lawsuit achieved "admirable results," and that the number of potentially deadly confrontations between prisoners and prison staff decreased immediately upon the filing of the suit. *Id.* Furthermore, any argument that plaintiffs' suit merely coincided with, and was not the impetus for change found no evidentiary support and amounted to "pure speculation." *Id.*

Alternatively, the court ruled:

> [t]o the extent that the court is obliged to find that the post-PLRA fees were 'directly and reasonably' incurred in proving a violation of a prisoner's rights, the court does so here. All of the evidence provided by plaintiffs shows there were violations of prisoner's constitutional right[s] on an ongoing basis at ESP, and that this litigation caused those injurious practices to cease.

*Id.* at n. 1 (internal citations omitted). Plaintiffs were therefore deemed the "prevailing parties" for purposes of attorneys fees under § 1988. *Id.* at 1173–74.

In *Sablan,* plaintiff challenged the government's termination of his electrical power absent prior notice or hearing in violation of due process. 856 F.2d at 1325. The government argued that the subse-

quent settlement of the matter precluded recovery of attorneys fees under § 1988. The Ninth Circuit held that:

> the fact that the present litigation culminated in a stipulation between the parties to dismiss their claims and counterclaims, rather than a formal judgment or consent decree awarding damages or imposing a permanent injunction, does not, in itself, dispose of the question whether [plaintiff] prevailed within the meaning of section 1988. Our initial inquiry focuses, instead, on the substance of the litigation's outcome to determine if significant results were achieved by initiating suit.

856 F.2d at 1324 (internal quotations and citations omitted). Plaintiff must therefore demonstrate that his lawsuit acted as a catalyst which prompted action on behalf of the defendants. *Id.* at 1325; *see also Doty v. County of Lassen,* 37 F.3d 540, 547 (9th Cir.1994) (in determining "prevailing party" status, plaintiffs are entitled to credit for "catalytic" changes in prison policy resulting from litigation even if those changes are not incorporated into or required by a court order).

■ The Court bifurcated into two subsidiary inquiries whether the lawsuit was a catalyst for reform. *Id.* First, the courts determine what the plaintiff sought to accomplish by way of his lawsuit and whether the suit can be causally linked to the relief ultimately obtained. *Id.* (citing *California Ass'n of the Physically Handicapped, Inc. v. FCC,* 721 F.2d 667, 671 (9th Cir.1983); *Fitzharris v. Wolff,* 702 F.2d 836, 838 (9th Cir.1983)). This "causal link" prong of the "catalyst" test is tantamount to examination of factual causation. *Id.* (citing *Fields v. City of Tarpon Springs,* 721 F.2d 318, 321 (11th Cir.1983)). Second, there must be a legal basis for the plaintiff's claim such that it is not frivolous, unreasonable or groundless. *Id.* This step insures that the defendant did not act gratuitously in the face of an otherwise frivolous or legally insignificant claim. *Id.*

Applying the "catalyst" test to the facts of the case, plaintiff rightly deserved an attorneys fee award. After filing suit, plaintiff obtained a temporary restraining order requiring the restoration of power; more importantly, however, was the fact that the government abandoned its practice of terminating electrical service without prior notice or hearing after plaintiff's lawsuit. *Id.* The Court focused extensively upon the district court's decision, which included the conclusion that " 'it was only after the government was sued ... that they decided to formulate, and promulgate regulations regarding utility terminations.' " *Id.* at 1326. The Court found that it need "pause only momentarily" on the second prong of the test, for it was "too late in the day" to argue that defendants' actions were consistent with the right of notice and the opportunity to be heard. *Id.* at 1327. Accordingly, plaintiff satisfied both prongs of the "catalyst" test and stood as the "prevailing party" within the meaning of § 1988, notwithstanding the absence of formal judgment, consent decree, injunction or monetary damages. *See Id.*

The Court also notes Judge Erickson's learned decision in *Langford v. Racicot,* CV 93–46–H–LBE (Sept. 30, 1999), which echoes the policy of the foregoing authority and parallels in all relevant respects the facts of the instant case. There, defendants argued against fees under the PLRA because plaintiffs failed to prove an actual violation of rights. *Id.* at 6. Like the parties in this case, the litigants in *Langford* could not point to case law addressing the precise issue of whether attorney fees under the PLRA are recoverable absent a concomitant finding of an "actual violation." *Id.* Nonetheless, the Court held that "a review of decisions addressing attorney fees under the PLRA suggest a plaintiff need not actually prove his rights have been violated to recover fees under the PLRA." *Id.* Judge Erickson's inquiry included consideration of cases in which the courts addressed PLRA fees while passing upon the opportunity to prohibit

the award of post-PLRA, post-judgment attorney's fees. *Id.* (citing *Martin v. Hadix*, 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999); *Weaver v. Clarke*, 933 F.Supp. 831, 836 (D.Neb.1996)). He further analyzed the PLRA's companion statute, 42 U.S.C. § 1988, and noted that "[i]t has long been the rule under 42 U.S.C. § 1988 that attorney fees may properly be awarded to a prevailing party even if a dispute was settled prior to adjudication on the merits." *Id.* at 7 (citing *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)). Accordingly, Judge Erickson awarded fees, notwithstanding the fact he had not specifically found an "actual violation" of Plaintiffs' rights.

That a plaintiff need not obtain a court order to receive pre- or post-judgment attorney's fees was the general rule before the Court's decisions in *Sablan* and *Langford*. In *Keith v. Volpe*, 833 F.2d 850 (9th Cir.1987), the Court addressed the collection of monitoring fees absent formal contempt findings. *Id.* at 857 ("Are Contempt Findings a Prerequisite to Section 1988 Awards for Monitoring?"). Providing for recovery of such fees, the Court reasoned that "a finding of contempt or obstruction is not a prerequisite for a section 1988 fee award for post-judgment monitoring activities." *Id.*

██ It is important to note, however, that notwithstanding post-decree facts independently militating in favor of "prevailing party" status, the entry of a consent decree actually satisfies the "prevailing party" requirement of § 1988. *See Gates v. Gomez*, 60 F.3d 525, 534 (9th Cir.1995). In *Gates*, defendants urged the Court to apply a "prevailing party" standard to post-judgment monitoring and compliance work under the terms of a consent decree. *Id.* Rejecting this contention, the Court held, "[b]ut plaintiffs have already met the section 1988 prevailing party standard with the entry of the consent decree." *Id.* (citing *Keith*, 833 F.2d at 857, for the proposition that "post-judgment monitor-

ing of the consent decree [in *Keith* ] was a necessary aspect of plaintiffs' prevailing in the case, thus plaintiffs satisfied the § 1988 prevailing party requirement.").

In that vein, this Court has also applied a "reasonableness" standard to the post-judgment collection of monitoring fees, and determined that it is "considerably less stringent" then the "prevailing party" standard. *Sage v. Risley*, 785 F.Supp. 134, 136 (D.Mont.1992). In *Sage*, plaintiff prisoners filed a motion for contempt against defendants after discovering that the prison housing them had not fully complied with the terms of a 1985 stipulation. *Id.* at 135–136. The parties subsequently effected a settlement agreement regarding the conditions giving rise to the contempt motion. *Id.* at 136. The parties left to Judge Hatfield the resolution of their attorney's fees dispute. *Id.*

At the outset, Judge Hatfield noted that a "reasonableness" standard applied to the contempt motion, and prompted inquiry into "whether the attorney's fees requested resulted from work that was reasonably necessary to the enforcement of the terms of that stipulation." *Id.* Judge Hatfield further recognized the rule that an award of fees for post-settlement monitoring "may be warranted even though there is no concomitant finding of contempt or obstruction." *Id.* (citing *Keith*, 833 F.2d at 857).

The Court found especially compelling Defendants' admission that they had not fully complied with the terms of the 1985 stipulation. *Id.* It found that "Defendants' concession that they failed to fully comply with the procedures agreed upon among the parties and reduced to written stipulation is sufficient for a finding that plaintiffs' efforts to enforce the stipulation were reasonable and, therefore, compensable." *Id.* This interpretation was consistent with the rule of law that services devoted to reasonable monitoring, both to insure full compliance and to guarantee a plan's effectiveness, are compensable services. *Id.*

### B. Policy Considerations Militate In Favor Of A Fee Award Following Pretrial Settlement.

Permitting post-judgment monitoring fees also squares with a policy encouraging parties to settle disputes rather than litigate them. *Langford* at 9. (citing *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994); *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933; *Marek v. Chesny*, 473 U.S. 1, 2, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985)). Upon recognition of this policy, Judge Erickson in *Langford* concluded that denial of PLRA fees on the basis of settlement would undermine the long-standing principle of encouraging settlement, rather than lengthy litigation, of claims. *Id.*

■ Recovery of fees following pretrial settlement also squares with Congress' intent that "a plaintiff need not obtain formal relief in order to recover fees." *See Keith*, 833 F.2d at 855–56. The *Keith* Court noted that as a matter of public policy, fee awards in post-consent decree monitoring cases should not hinge upon the litigation of a plaintiff's allegations. *Id.* More precisely, "extreme tension and animosity are [not] pre-conditions to a fee award of this sort. Forcing the parties to take up positions on the battlefield of litigation as a condition precedent to obtaining an attorney fee award is antithetical to the desired goal of amicable implementation of a consent decree." *Id.* (internal citations and quotations omitted).

Other courts have recognized the pitfalls of discouraging prompt resolution of claims under the PLRA. Although addressing a separate portion of the PLRA, the court's guidance in *Cooper*, 55 F.Supp.2d at 1090, is of particular import. *Cooper* addressed the imposition of a total exhaustion requirement under the PLRA that would require dismissal of all non-compliant claims. *Id.* at 1094. However, such a requirement would contradict congressional intent; Congress designed the PLRA to curtail meritless prisoner litigation, not to dismiss meritorious lawsuits on procedural grounds. *See id.* The court reasoned:

> ... as a purely practical matter, if the Court were to construe section 1997(e)(a) as imposing a total exhaustion requirement and dismiss the entire action, the prisoner would merely need to file a new suit alleging only his exhausted claims. Thus, because total exhaustion *delays the resolution of claims that are not frivolous and tends to increase, rather than alleviate, the caseload burden on the federal court, and the plain language of section 1997e(a) does not explicitly require it,* this Court has found it in the interests of judicial economy to reach the merits of those section 1983 claims that have been exhausted and dismiss only those that are not.

*Id.* at 1095 (internal citations and quotations omitted)(emphasis added).

### C. Plaintiffs Are Entitled To Reasonable Attorneys Fees.

■ The foregoing discussion makes clear Plaintiffs' entitlement to fees under the PLRA and § 1988. First, defense counsel does not dispute the facts alleged by Plaintiffs in their brief. This comes as no surprise, given that those facts come directly from Defendants' witnesses' depositions. The facts listed by Plaintiffs include citation to deposition testimony by Sheriff Barron and jail administrator Todd. That testimony demonstrates that: (1) Defendants were not fully complying with the terms or spirit of the 1996 Consent Decree; (2) Plaintiffs' contempt actions were meritorious insofar as they sought to remedy illegal conditions in contravention of the Consent Decree; (3) the contempt actions supplied the Sheriff and jail administrator with "ammunition" with which to force the county commissioners to effect change; and (4) problems giving rise to the contempt actions were satisfactorily resolved after those actions were filed. Although Defendants understandably, and commendably, settled the contempt actions pre-trial, the courts of this circuit have

made clear that such settlement does not foreclose the availability of attorney's fees. Clearly, Plaintiffs "have achieved their goal by causing a significant alteration" of Defendants' practices. *See Ilick,* 68 F.Supp.2d at 1172. Plaintiffs' suit satisfies the "catalytic relief" analysis employed by the courts of this circuit. First, Plaintiffs sought abatement of illegal conditions at LCDC in derogation of the parties' 1996, Consent Decree. As noted, the contempt actions were the impetus for subsequent remedial changes effected at the jail. The claims were not frivolous or groundless, as demonstrated by Defendants' actions after Plaintiffs filed the 1999, contempt actions. *See Doty,* 37 F.3d at 547; *Sablan,* 856 F.2d at 1325.

Defendants argue that "[n]owhere in the 1996 Consent Decree does it state that an 'actual violation' of Plaintiffs' 'rights protected by a statute pursuant to which a fee may be awarded under section 1988' was proven or stipulated," and that "[n]o declaration of actual violations has ever issued from this Court." Def.'s Br. pp. 5–6. However, controlling authority does not require this Court find an "actual violation" following a full-blown trial on the merits.[1] *See Hewitt,* 482 U.S. at 760–61, 107 S.Ct. 2672 ("a lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment . . . [and w]hen that occurs the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor."). Rather, this Court may find the requisite causal connection, which it has done today. Accordingly, Plaintiffs satisfy even the

heightened "prevailing party" standard for changes effected at LCDC as a result of the contempt motions and associated monitoring. This is true whether the Court relies exclusively upon the facts and outcomes of the contempt motions, or exclusively upon the Court's holding in *Gates* that an underlying consent decree actually bestows "prevailing party" status upon plaintiffs in a subsequent contempt action settled pretrial.[2]

A finding of "prevailing party" status also subsumes the lesser "reasonableness" standard discussed by the Court in *Sage.* Especially noteworthy in the case *sub judice* is the laundry list of aforementioned admissions by Defendants that certain conditions at LCDC warranted attention and correction following the filing of the contempt actions. As Judge Hatfield noted, "Defendants' concession that they failed to fully comply with [the underlying agreement] is sufficient for a finding that plaintiffs' efforts to enforce the stipulation were reasonable and, therefore, compensable." *Sage,* 785 F.Supp. at 136.

Lastly, the courts of this circuit, and the United States Supreme Court, have consistently promoted a policy of pretrial settlement. Defendants' interpretation not only forces litigiousness and punishes pretrial settlement of meritorious PLRA claims, but reads into the PLRA a non-existent requirement—there is nothing in the body of the PLRA, or § 1988, that expressly requires formal adjudication of prisoners' claims as a condition precedent to an award of § 1988 fees. *See Cooper,* 55

---

1. To the extent this Court is obliged to find that Plaintiffs' fees were incurred "directly and reasonably" in demonstrating a violation of prisoners' rights, it does so here. The uncontroverted evidence supplied this Court evinces violations of the Consent Decree and Plaintiffs' rights, and that the contempt motions not only brought such violations to Defendants' attention, but forced remedial action. *See Ilick,* 68 F.Supp.2d at 1172 & n. 1.

2. The Court notes that many courts, such as *Sage* and *Gomez,* either tacitly or expressly

refused application of the heightened "prevailing party" standard in favor of the lesser "reasonableness" standard for post-judgment monitoring. Although the Court could rely exclusively upon the "reasonableness" standard set forth in *Sage,* the facts of this case also support the heightened "prevailing party" standard, and the Court cites to that standard not only in awarding fees, but particularly in demonstrating the strength and sufficiency of evidence before it.

F.Supp.2d at 1095 ("as a purely practical matter," courts will not apply PLRA in manner contrary to policy of pretrial resolution or require more of the parties than that contained within the plain text of the Act); *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) ("nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated."). Therefore, under any standard, and for the foregoing reasons, Plaintiffs are entitled to reasonable fees associated with the prosecution of the 1999, contempt actions.

### III    Fee Calculation

"The starting point for determining a reasonable fee is the 'lodestar' figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate." *Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir.1992) (citing *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)); *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. The fee applicant bears the burden of documenting hours appropriately spent in the prosecution of plaintiff's claim(s), and must submit evidence in support of those hours. *Id.* (citing *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933). The party opposing the fee application carries the burden of rebuttal. *Id.* The burden of rebuttal requires submission of evidence challenging the accuracy and reasonableness of hours charged, or factual assertions made in affidavits submitted by the prevailing party. *Id.* at 1397–98 (citing *Blum v. Stenson,* 465 U.S. 886, 892 n. 5, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Toussaint v. McCarthy,* 826 F.2d 901, 904 (9th Cir.1987)); *see also Gates v. Gomez,* 60 F.3d at 534–35; *Gates v. Rowland,* 39 F.3d 1439, 1449 (9th Cir. 1994).

" 'The district court has a great deal of discretion in determining the reasonableness of the fee and, as a general rule, [appellate courts] will defer to its determi-

nation.' " *Gates v. Gomez,* 60 F.3d at 534 (quoting *Gates v. Deukmejian,* 987 F.2d at 1398). This is appropriate in view of the district court's superior understanding of the proceedings before it and the desirability of avoiding appellate review of factual matters. *Id.* That said, the court must articulate its reasons for the ultimate fee award. *Id.*

■ Defendants do not attack the accuracy or veracity of Plaintiffs' fee application and the time Plaintiffs' counsel purportedly spent in this matter. They proffer no challenge to any individual entry, or group of entries, contained in the application. Rather, Defendants mount a challenge to the entirety of Plaintiffs' request because Plaintiffs "have failed to produce evidence showing that the Consent Decree should not have been terminated or stayed." Def.'s Br. p. 8, lns. 4–6.

Defendants filed a Motion to Terminate Consent Decrees dated April 28, 1999. Defendants premised the motion upon a provision within the PLRA providing for the termination of consent decrees within two years unless plaintiffs demonstrate continuing violations of federal law. Plaintiffs opposed Defendants' motion and requested this Court stay consideration pending the outcome of trial because they planned to present "compelling" evidence at trial of ongoing violations. The Court subsequently denied Defendants' request for termination in a July 15, 1999, Order, which held that both Plaintiffs' contempt motion and Defendants' motion to terminate would be resolved in a single trial. Obviously, the Court subsequently vacated that trial upon pretrial settlement. Defendants argue that Plaintiffs have never produced the "compelling evidence," and point to the fact that the underlying decree has been terminated absent such demonstration. Accordingly, "[h]aving avoided an immediate stay of the Decree by claiming a need to gather evidence of Federal [*sic*] rights violations, Plaintiffs [*sic*] counsel would now characterize their work in the

interim as 'monitoring' for which they should be compensated. Plaintiffs should not have it both ways." Def.'s Br., p. 9, lns. 10–16. Essentially, Defendants' argue that Plaintiffs prevented termination of the Consent Decree with evidentiary promises that did not come true, and should therefore not be rewarded with what they characterize as manufactured "interim monitoring fees."

### A. Plaintiffs Cannot Be Denied Fees On The Grounds That Pretrial Settlement Prevented The Presentation Of Evidence.

Bereft of citation to case or statutory authority, Defendants' aforementioned position fails for many of the same reasons the Court has ruled in favor of Plaintiffs on the question of proving an "actual violation." First, the Court, not Plaintiffs, denied Defendants' motion to terminate. That the motion could not be appropriately granted in the face of trial cannot be laid upon Plaintiffs' shoulders. More importantly, the ongoing contempt actions essentially prevented termination because they alleged continuing violations—an exception to the two-year PLRA termination rule. Defendants actually admitted violations in deposition testimony. Under Defendants' reasoning, then, settlement retroactively cleaves Plaintiffs' right to monitoring fees associated with the contempt actions, even where Defendants, and the parties' settlement, admits some form of wrongdoing. This is precisely the reason why the courts have consistently stated that settlement entitles parties to fees without any express, judicial findings. That Plaintiffs "never" demonstrated the compelling evidence Defendants long to see is of no particular import when one considers the pretrial settlement of this matter. Defendants cannot settle a case, promise reform or continued compliance, admit the previous existence of illegal conditions, admit that Plaintiffs' legal action actually brought the illegal conditions to the attention of those in a position to change them, and subsequently deny fees by alleging a failure of proof. This is not sound policy, and certainly is not the law. It is a repackaged "actual violation" argument that must be denied.

### B. Plaintiffs' Proposed Hours Are Reasonable.

The Court may quickly dispose of any objections Defendants might have to the propriety of specific entries contained within Plaintiffs' counsel's timesheets or affidavits, because none are voiced. Where a party fails to articulate the amount of time to which it objects, or the grounds for such objection, that party fails to satisfy the rebuttal burden. *Gates v. Gomez*, 60 F.3d at 535. Notwithstanding Defendants' silence, the Court must nonetheless endeavor to independently evaluate Plaintiffs' entries and provide a "concise but clear explanation of its reasons for the fee award." *Gates v. Deukmejian*, 987 F.2d at 1398. The Court notes, however, that Defendants' failure to challenge Plaintiffs' application in this regard is significant, especially when one considers that Defendants, as parties to the lawsuit, are in the best position to evaluate Plaintiffs' hours and attack those it considers inefficient, duplicative or otherwise inappropriate.

Defendants' silence aside, the Court has independently reviewed Plaintiffs' entries. Entries, encompassing extended hours were almost exclusively limited to: (1) legal research and brief and motion writing; (2) conducting written discovery; (3) inspections of LCDC; (4) business before the Court; (5) preparing for and taking depositions; and (6) contact with experts. All of these activities would be expected to impose greater time requirements upon counsel, and are permissible.

All other entries appear reasonable. The majority of additional entries constitute normal communication with clients and clients' families, correspondence, e-mails, phone calls, etc., and are precisely the sort of tasks in which counsel must

engage in order to research, understand and sustain his or her case.

■ It is this Court's task to:

> exclude from [the] initial fee calculation hours that were not reasonably expended. Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice is ethically obligated to exclude hours from his fee submission. In the private sector, billing judgment is an important component in fee setting. It is no less important here.

*Gates v. Deukmejian,* 987 F.2d at 1397 (citing *Hensley,* 461 U.S. at 433–34, 103 S.Ct. 1933; *City of Riverside v. Rivera,* 477 U.S. 561, 569, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)) (internal quotation marks omitted). Two attorneys worked on this case, one significantly more than the other. The case has not been overstaffed, and the quality of work and ultimate outcome demonstrate the experience and skill of both. Nothing appears excessive, redundant, or otherwise unnecessary. Time spent is well documented and even more than the law requires. *See Davis v. City and County of San Francisco,* 976 F.2d 1536, 1542 (9th Cir.1992) (warning against imposing too high a standard for documentation of fee claims). The Court finds Plaintiffs' fee calculations as it would expect to find any reasonable fee calculation in a similarly-situated and styled case. Mr. Pevar is therefore entitled to receive compensation for 502.3 hours of work on the above-captioned matter between September, 1998, and the present. Mr. Connell is entitled to receive compensation for 67.35 hours between April, 1998, and the present.

Having determined the hours to which Plaintiffs' attorneys are entitled to compensation, the Court next must determine appropriate rates for each. As noted, "[t]he starting point for determining a reasonable fee is the 'lodestar' figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate." *Gates v. Deukmejian,* 987 F.2d at 1397 (citing *City of Burlington,* 505 U.S. at 557, 112 S.Ct. 2638; *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933). In pertinent part, 42 U.S.C. § 1997e(d)(3) provides that, "[n]o award of attorney's fees ... shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of title 18 [Civil Justice Reform Act (CJRA) ]." As Judge Erickson noted in *Langford,* the prevailing CJA rate for time reasonably expended out of court in Montana is $45.00 per hour. *Langford* at 10. Mr. Connell is therefore entitled to $67.50 per hour for 67.35 hours, which totals $4,546.13. Meanwhile, the prevailing rate for time spent out of court in Colorado is $75.00 per hour.

The Court finds that Mr. Pevar is entitled to a heightened compensation rate. *See Langford* at 10–12. The heightened rate for Mr. Pevar is appropriate given that local counsel are reluctant to prosecute prisoner rights cases absent the assistance, if not the lead, of out-of-state counsel, such as those supplied by the ACLU. *See* Aff. Scott Crichton pp. 2–4; Aff. Mark. S. Connell, p. 2; *see also Gates v. Deukmejian,* 987 F.2d at 1405 ("rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform or they lack the degree of experience, or specialization required to handle properly the case."). Plaintiffs seek a rate of $112.50 per hour for Mr. Pevar. The Court is mindful that Mr. Pevar provided substantial assistance and generated more than adequate work product in the prosecution of the contempt actions. However, the Court is reluctant to award such an amount. The work he produced was not so specialized as to warrant a full $45.00 per hour more than a capable Montana practitioner. As Judge Erickson noted, "[i]f, in actually calculating Plaintiffs' fee award the Court finds the *reasonable* rate is less than the maximum rate, the Plain-

tiffs will be paid the reasonable rate." *Langford* at 10 (emphasis in original) (citing *Alexander v. Boyd,* 113 F.3d 1373, 1388 (4th Cir.1997)). Considering the type of work performed in this case and the value of Mr. Pevar's services, he is entitled to $80.00 per hour at 502.3 hours, which totals $40,184.00

### C. Plaintiffs' Costs.

The majority of Plaintiffs' costs appear acceptable for many of the same reasons their fees are reasonable. Mr. Pevar receives $ 6,210.95 in costs. Mr. Connell receives $100.02 in costs.

## CONCLUSION

Based upon the foregoing,

**IT IS ORDERED** that Plaintiffs' attorneys are entitled to fees and costs under the terms of 42 U.S.C. § 1988, and shall be compensated as follows:

1. Defendants shall pay Mr. Connell $4,546.00 in fees and $100.02 in costs; and

2. Defendants shall pay Mr. Pevar $40,184.00 in fees and $6,210.95 in costs.